IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| FIRST SPECIALTY INSURANCE CORPORATION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) | Case No. 04-2359-JPO |
| NOVAPRO RISK SOLUTIONS, LP, et al., | ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM AND ORDER

### I.  Introduction

This insurance case arises out of the settlement of a New Jersey personal injury lawsuit filed by a nightclub patron who was attacked by unknown assailants.  The present case involves an equitable subrogation claim by one insurer of the nightclub against another, and a negligence claim by the first insurer against its claims administrator.

The court has diversity subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1).  Although the underlying occurrence and litigation both were in New Jersey, this case was filed in Kansas because one of the insurers and its claims administrator transact business here.

Pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, the parties consented to the disposition of this case by U.S. Magistrate Judge James P. O'Hara, and also waived a jury trial.  A seven-day bench trial was held in late November 2006.  As required by Fed. R. Civ.

04-2359-JPO-trial.wpd

P. 52(a), this memorandum and order will serve as the court's findings of fact and conclusions of law.

## II.   Uncontroverted Facts

The final pretrial order filed pursuant to Fed. R. Civ. P. 16 on March 20, 2006 (doc. 190, pp. 3-8), reflects that the parties have stipulated to many of the material facts of this case, specifically, as follows:[1]

Although for different one-year policy periods, the plaintiff, First Specialty Insurance Corporation ("First Specialty"), and defendant Underwriters at Lloyd's, London, a/k/a Certain Underwriters at Lloyd's, London ("Lloyd's"), shared a common insured, namely, Omnium Corporation, d/b/a Hunka Bunka Ballroom ("Hunka Bunka"), which operated a very large nightclub in Sayreville, New Jersey.  Lloyd's issued Policy No. PNJ2019 (the "Lloyd's policy"), which was in effect from August 15, 1999 through August 15, 2000.  Exhibit 149.  First Specialty issued Policy No. PGL 70219 (the "First Specialty policy"), which was in effect from August 15, 2000 to August 15, 2001.  Exhibit 603.  The insured, Hunka Bunka, obtained each of these commercial general liability ("CGL") policies by applying for coverage through a local New Jersey insurance agency, Connolly, Campion & Wright ("Connolly").

The nightclub patron and claimant in the underlying case, Vincent Femia, was attacked and beaten by several unknown persons while at Hunka Bunka during the late

---

[1] The court has supplemented the parties' pretrial stipulations with citations to certain exhibits that were admitted into evidence during trial.

evening hours of April 22, 2000 (or the very early morning hours of April 23, 2000). Regardless of whether Femia was injured on April 22nd or April 23rd, this occurrence was within the effective dates of the Lloyd's policy.  And, of course, it follows that the occurrence was outside the effective dates of the later-issued First Specialty policy.

Approximately ten months after Femia was attacked in April 2000, Hunka Bunka received a letter dated February 14, 2001 from Femia's attorney (at that time, Damon A. Vespi).  Exhibit 175.  The letter did not state the date on which Femia had been injured.  Nor did the letter make any settlement demand.  It just informed Hunka Bunka that Femia had sustained personal injuries while a patron at the nightclub, that Femia had retained Vespi, and that Vespi wanted to be contacted by the nightclub's liability insurer.

Above five weeks later (i.e., on or about March 20, 2001), Hunka Bunka notified Connolly of Vespi's February 14, 2001 letter, and provided Connolly a copy of the letter. Exhibit 255.  On or about March 23, 2001, defendant NovaPro Risk Solutions, LP, f/k/a Ward North America Holding, Inc. and formerly d/b/a Ward North America, Inc. ("Ward"), acting in its contractual capacity as First Specialty's third-party claims administrator ("TPA"), received a copy of the February 14, 2001 letter from Connolly.  Exhibit 177.

On October 15, 2001, about eight months after first giving written notice of Femia's claim, Vespi filed suit on behalf of Femia against Hunka Bunka in the Superior Court of Middlesex County, New Jersey.[2]  Exhibit 40.  Ward assigned the personal injury lawsuit to

---

[2] When Vespi became seriously ill in March 2002, Femia's representation in the
(continued...)

Stephen Wellinghorst, one of Ward's regular insurance defense attorneys in New Jersey.  On or about November 8, 2001, Wellinghorst wrote Ward and formally acknowledged his assignment to defend Hunka Bunka.  On November 14, 2001, Wellinghorst filed an answer to Femia's complaint on behalf of Hunka Bunka.  Exhibit 1.

On or about June 29, 2002, the Middlesex County Superior Court sent a notice to counsel of record reminding them that the period allowed for discovery in the Femia case was set to end September 10, 2002.  Exhibit 628.  On or about September 3, 2002, the court sent another notice to counsel setting a non-binding arbitration hearing for November 19, 2002.  Exhibit 643.  The arbitration hearing in the Femia suit against Hunka Bunka actually occurred on January 7, 2003.  In any event, as a result of that proceeding, the arbitrator, Rochelle Gizinski (an attorney in private practice), found that Hunka Bunka was 100% liable for Femia's injuries and awarded him $175,000 in damages.[3]  Exhibit 61.

It was not until March 17, 2003 (nearly two years after Hunka Bunka notified Connolly of the claim, and more than two months after the non-binding arbitration proceeding), that Ward notified Metcom Excess ("Metcom"), of Femia's claim and lawsuit against Hunka Bunka.  The next day (March 18, 2003), Metcom notified G.A. Mavon &

---

[2](...continued)
Hunka Bunka case was assumed by another personal injury lawyer, Gabriel ("Gabe") H. Halpern.

[3] But, as explained further in section III(F) below, *neither* party to the Femia case was willing to accept the $175,000 arbitration award, and thus the award was essentially a nullity.  *See* Exhibits 3, 30, and 167A, p. 71.

Company ("Mavon"), the managing general agent identified for notice-of-claim purposes in the Lloyd's policy, of the claim and suit.  Exhibit 20.

Femia's deposition was taken by Wellinghorst on March 21, 2003.  Exhibit 79.

On March 24, 2003, Lloyd's TPA, Elliston, LLC ("Elliston"),[4] received notice of Femia's claim and lawsuit against Hunka Bunka from Mavon.  Exhibit 115.

In late March 2003, Lloyd's retained coverage counsel in New Jersey, Stanley W. Kallman, to review Wellinghorst's file.  Exhibit 13.

On April 22, 2003, Janet Van Pelt, a claims adjuster at Elliston, wrote to Amy O'Quain, a claims adjuster at Ward, stating that, "after a careful review of your defense attorney's file and the materials that you forwarded to our office, at this time we must reject your request for Underwriters to defend Hunka Bunka Ballroom."  Exhibit 4.

On May 13, 2003, O'Quain responded to Van Pelt's letter of April 22, 2003.  Exhibit 138.

At Wellinghorst's request (on behalf of Hunka Bunka), Stephen H. Fried performed an independent medical evaluation of Femia on May 9, 2003.  Exhibit 37.

The depositions of David Beckler and Michael Bivona, two of Femia's friends who witnessed some of the subject events at Hunka Bunka, were taken in the Femia case in June 2003.  Exhibits 85 and 87, respectively.

---

[4] Elliston previously was a named defendant in the case at bar, and shared common counsel of record with Lloyd's.  In an order entered on December 15, 2005 pursuant to Fed. R. Civ. P. 12(b)(6) by the Hon. John W. Lungstrum, U.S. District Judge, First Specialty's claims against Elliston were dismissed (doc. 161).

On or about June 4, 2003, Wellinghorst's investigator obtained a written statement from Dimitrios Katsoulis, who was a manager at the nightclub.

The deposition of Frank DiComo, another one of Femia's friends and witnesses, was taken in the Femia case on August 11, 2003.  Exhibit 81.

First Specialty paid for Hunka Bunka's attorneys' fees and costs associated with the defense of the Femia case.

In August 2003, First Specialty settled Femia's claim and lawsuit against Hunka Bunka for $445,000 in exchange for a full release of Hunka Bunka and its insurers.  Exhibit 271.

### III.   Findings of Fact

As set forth above, there is substantial agreement among the parties concerning many material facts.  Highly summarized, there is no dispute that Femia was injured at Hunka Bunka in April 2000; that the Lloyd's policy was in effect at that time; that a claim should have been made by or on behalf of Hunka Bunka under the Lloyd's policy instead of the First Specialty policy; that Ward, as First Specialty's TPA, had a contractual duty to determine at the outset that Lloyd's (not First Specialty) was obligated to defend the claim; that Ward failed to fulfill its contractual duty as TPA to determine coverage correctly; and, that as a result of the foregoing mistake, First Specialty, through Ward, undertook Hunka Bunka's

defense without the benefit of any reservation of rights concerning the coverage dispute that is now before the court.[5]

Under the substantive law of New Jersey, which the parties agree controls First Specialty's claims against Lloyd's, the dispositive mixed issue of fact and law in this case is whether Lloyd's was *prejudiced* by a breach of the standard CGL policy provision that requires timely notice of a claim to be provided by the insured to the insurer.[6] Of course, the court must first determine *if* there was a breach of the notice provision of the Lloyd's policy. If it was not breached (as First Specialty asserts), then the issue of prejudice is moot. But on the other hand, if the notice provision was breached (as Lloyd's asserts), the court must determine whether Lloyd's was prejudiced by that breach. The prejudice issue, under New Jersey law, in turn, hinges on the answers to two questions. First, did Lloyd's irretrievably lose substantial rights pertaining to Hunka Bunka's defense as a result of the late notice? And second, if Lloyd's had received timely notice, did it have a likelihood of success in defending against Femia's claim?

The court has endeavored to scour the voluminous trial record in light of First Specialty's and Lloyd's proposed findings of fact and conclusions of law as they relate to the disputed aspects of this case (docs. 366 and 369, respectively).[7] Having had an opportunity

---

[5] It should be noted that Ward did issue a reservation-of-rights letter to Hunka Bunka. But it was on grounds immaterial to the present litigation. Exhibit 167A, pp. 64-66.

[6] *See* section IV(B) below.

[7] Proposed findings of fact and conclusions of law were *not* filed by Ward because it
(continued...)

to observe and reflect on the credibility of the various witnesses' testimony, to assess the relative weight of all the evidence that was admitted, documentary and otherwise, the court will now proceed to find the material facts beyond the stipulated ones set forth in section II above.

A.      The Notice Provisions of the Lloyd's Policy.

At the outset, it should be noted that neither Femia nor Hunka Bunka are parties to the present litigation because, as part of the August 2003 settlement, Femia was paid $445,000 in return for a full release of Hunka Bunka and its insurers.  Nevertheless, to properly analyze the ultimate legal issues of whether Lloyd's should be adjudicated an equitable subrogor of First Specialty and whether First Specialty is entitled to recover on its negligence claim against Ward, the court must begin its factual findings by examining Hunka Bunka's contractual responsibilities to Lloyd's.

The Lloyd's policy states on the very first page, and also on its declarations page, that the insured (Hunka Bunka) must notify Mavon (Lloyd's managing general agent) in the event of a claim.  Exhibit 149.  The Lloyd's policy also contains the following provision pertaining to the insured's duties in the event of an occurrence, claim, or suit:

> a.      You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim.  To the extent possible, notice should include:

---

[7](...continued)
was originally anticipated that First Specialty's negligence claim against Ward would be decided by a jury.  At the eleventh hour, Ward waived its demand for a jury trial.

(1)     How, when and where the "occurrence" or offense took place;

(2)     The names and addresses of any injured persons and witnesses; and

(3)     The nature and location of any injury or damage arising out of the "occurrence" or offense.

b.     If a claim is made or "suit" is brought against any insured, you must:

(1)     Immediately record the specifics of the claim or "suit" and the date received; and

(2)     Notify us as soon as practicable.

You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

c.     You and any other involved insured must:

(1)     Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit;"

(2)     Authorize us to obtain records and other information;

(3)     Cooperate with us in the investigation, settlement or defense of the claim or "suit;" and

(4)     Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

The evidence at trial was uncontroverted that Hunka Bunka never notified Lloyd's, Mavon, or Elliston upon the Femia occurrence of April 22-23, 2000, upon Hunka Bunka's receipt of the letter from Femia's attorney dated February 14, 2001, or upon the filing of

Femia's suit on October 15, 2001.  Instead, on or about March 20, 2001, Hunka Bunka simply notified Connolly, the insurance agency through which Hunka Bunka obtained both the Lloyd's policy and the First Specialty policy, and sent Connolly a copy of the February 14, 2001 letter.  Exhibit 255.

It was likewise uncontroverted at trial that Connolly never notified Lloyd's, Mavon, or Elliston of the Femia claim.  Presumably because the initial letter from Femia's lawyer (Exhibit 175) did not state a specific date of occurrence, but was dated and received within the effective dates of the First Specialty policy, Connolly notified First Specialty's TPA (Ward) of the Femia claim on or about March 23, 2001, and Ward then began to process the claim.  Exhibit 167A, p. 1.  This, obviously, was a mistake by Connolly and Ward.  That is, both the Lloyd's and First Specialty's CGL policies were of the "occurrence" instead of the "claims made" variety.[8]

In any event, as earlier indicated, Mavon was not notified of the Femia claim and lawsuit until nearly two years later, on or about March 18, 2003.  Exhibit 20.  Elliston first received notice of the Femia claim and lawsuit on March 24, 2003.  Exhibit 21.

Based on the foregoing, Lloyd's asserts that the notice provision of its CGL policy obviously was breached by Hunka Bunka.  First Specialty responds by arguing that the court should find no breach of the notice provision of the Lloyd's policy because, viewed from the

---

[8] As the names suggest, coverage exists under an occurrence-type policy if the subject occurrence took place within the effective dates of the policy, whereas coverage exists under a claims made-type policy depends on when the claim is made against the insured.

perspective of the reasonable expectations of the insured (Hunka Bunka), there was nothing unusual or surprising about the fact that Hunka Bunka notified Connolly of the Femia claim, and failed to notify Mavon directly.  The court disagrees.  Although Hunka Bunka understandably may have notified Connolly of the Femia claim, standing alone that cannot modify the clear terms of the Lloyd's policy.  Under the facts of this case, the court finds that Hunka Bunka's notice to Connolly of the Femia claim was insufficient to satisfy the notice provision of the Lloyd's policy.[9]  Therefore, the court finds that Hunka Bunka materially breached the notice provision of the Lloyd's policy.

B.      Lloyd's Response to the Late Notice of Claim.

As noted above, Elliston (Lloyd's TPA) did not learn of the Femia claim until March 24, 2003.  The very next day, Janet Van Pelt, a claims adjuster with Elliston, wrote to her counterpart, Amy O'Quain of Ward, stating that it was Elliston's opinion that Lloyd's "may have been severely prejudiced," and that Elliston had retained coverage counsel to review the matter.  Exhibit 10.  Van Pelt, therefore, requested that Ward continue to handle the Femia matter until further notice from Elliston.  Obviously, this was the only prudent thing Lloyd's and Elliston could have done under the circumstances.

---

[9] The court so finds despite stating in a previous order denying First Specialty's motion for summary judgment, that "[a] review of the notice provision of [the Lloyd's policy] reveals that it is rather ambiguous on its face."  Doc. 214, p. 11.  With the benefit of the entire trial record now before it, the court is persuaded that the only reasonable construction of the Lloyd's policy is that it required Hunka Bunka (or at least someone on Hunka Bunka's behalf) to notify Mavon.

Approximately one month later, on April 22, 2003, Van Pelt wrote to O'Quain again, stating that Elliston was rejecting Ward's request for Lloyd's to defend Hunka Bunka because of Elliston's dissatisfaction with Ward's handling of the case to that point.[10] Exhibit 4. Specifically, Van Pelt criticized what she asserted to be the failure to: "conduct appropriate discovery of eyewitnesses identified by the plaintiff or to locate and interview employee/witnesses of the defendant insured," conduct the plaintiff's deposition prior to the non-binding arbitration hearing, consult a security expert, obtain an independent medical examination, and obtain photographs of the plaintiff's injuries. Van Pelt also stated that Ward's rejection of the $175,000 arbitration award was "not the result of considered judgment and was improvident."[11]

Despite Van Pelt's criticisms of Ward, she stated in her April 22, 2003 letter that Elliston would reconsider its rejection if "[Wellinghorst] obtains photographs of the plaintiff, schedules (with the concurrence of plaintiff's counsel and/or the Court) the depositions of the eyewitnesses identified by the plaintiff, and if you locate, interview and (if useful)

---

[10] During trial of the instant case, Van Pelt admitted that Elliston's coverage counsel essentially drafted the April 22, 2003 letter; after discussing the subject with counsel, Van Pelt only edited the letter a bit before sending it to O'Quain.

[11]Although unknown by Van Pelt at the time, against Wellinghorst's recommendation (Exhibit 67), Ward had instructed Wellinghorst to file papers on behalf of Hunka Bunka rejecting the $175,000 arbitration award, which he did (Exhibit 167A, p. 71). This decision by Ward, regardless of whether or not it showed poor judgment or was improvident as asserted by Van Pelt, turned out to be moot. It was moot because the evidence at trial was uncontroverted that Femia and his trial lawyer (Gabe Halpern) believed the $175,000 award was *too low* and that Halpern would have timely rejected the award even had Wellinghorst's recommendation been followed by Ward.

statementize all employee/witnesses identified by the insured, scheduling (with the consent of plaintiff's counsel and/or the Court) depositions of the witnesses who might produce useful testimony."  Further, Van Pelt instructed Ward to secure an adjournment of the existing June 23, 2003-trial date in the Femia matter.

Significantly, most if not all of the conditions stated in Van Pelt's April 22, 2003-letter already had been met or were met soon afterward.  But, the evidence is uncontroverted that Lloyd's never reconsidered its position and assumed the defense of Hunka Bunka from First Specialty.

C.    First Specialty's Continued Defense of Hunka Bunka After Lloyd's Refusal of Tender.

O'Quain responded to Van Pelt by letter dated May 13, 2003.  Exhibit 138.  O'Quain stated that Ward had requested photographs of Femia, but that his scars had basically healed. She explained that Ward had taken statements from some of the Hunka Bunka "bouncers" (nightclub security personnel) during Ward's investigation of the Femia matter, but that these individuals were not good witnesses, meaning they would not make favorable impressions on a jury at trial.  She stated that Ward had hired an investigator to locate other witnesses, however, they could not be found at the addresses provided.  She indicated that Femia's follow-up medical examination was scheduled for May 9, 2003, and that his deposition had been rescheduled a number of times for various reasons.  She also stated that Ward did not receive Femia's retained liability expert report on nightclub security issues until January 2003; that the confidential preliminary report from Wellinghorst's consulting security expert

was unfavorable; that counsel had attempted to adjourn the arbitration due to incomplete discovery; that regardless of whether the $175,000 arbitration award was reasonable, Femia would not accept the award; and, that Wellinghorst felt that a further adjournment of the June 2003 trial date to August 2003 could be obtained.[12]

The record reflects that, after Ward first received notice of the Femia claim in March 2001, adjusters at Ward began investigating the claim.  Lloyd's asserts, with some reason, that Ward was less than vigilant in the latter's pre-suit investigation.  Specifically, Lloyd's asserts that Ward waited far too long before sending out investigators to "tie down" the various witnesses' testimony via signed statements.

To be sure, the court came away from trial with the distinct impression that, at best, Ward did average or "C" work on the Femia claim *before* suit was filed.  The record is very thin as to whether the way in which the Femia claim was handled by Ward was materially better or worse than other claims it was adjusting for First Specialty and other insurers.  Nevertheless, *after* suit was filed in October 2001, the record suggests that Ward and Wellinghorst together took reasonable actions to investigate and defend the Femia claim.

According to Wellinghorst's law firm billing records (Exhibit 38), from November 2001 (when he first received the assignment to defend Hunka Bunka), to March 2003 (when

---

[12] Trial of the case against Hunka Bunka, at least originally, was scheduled for April 7, 2003.  But, on February 21, 2003, Halpern, with Wellinghorst's consent, requested an adjournment of that trial setting.  Exhibit 267.  The trial was continued to June 23, 2003.  On June 12, 2003, Wellinghorst, with Halpern's consent, requested another adjournment to mid-August 2003.  Exhibit 268.

Lloyd's and Elliston were notified of the Femia case), Wellinghorst took the following actions on behalf of Hunka Bunka:  reviewed Femia's pleadings; prepared and filed an answer; propounded interrogatories to Femia which were answered (*see also* Exhibits 2 & 42); corresponded with Halpern regarding discovery; corresponded with Ward regarding its initial evaluation of the claim; requested and reviewed police reports from the Sayreville Police Department (*see also* Exhibit 35); corresponded with Hunka Bunka regarding answering standard discovery requests; reviewed the First Specialty policy; prepared responses to Femia's discovery requests; prepared for and attended depositions of Femia's witnesses; scheduled and rescheduled Femia's deposition; prepared for and attended Connor's deposition; prepared for and attended the mandatory non-binding arbitration proceeding;[13] obtained and reviewed plaintiff's medical records (*see also* Exhibit 66); prepared a pretrial report (*see also* Exhibit 8); and obtained and reviewed a report from a consulting security expert, Ira S. Somerson (*see also* Exhibit 31).

Regardless of what was recorded on Wellinghorst's time sheets, his trial testimony established that he also interviewed Hunka Bunka's president/part owner (Kip Connor), Hunka Bunka's manager (Dimitrios Katsoulis), and several of the bouncers who were on duty the night Femia was attacked.  According to Wellinghorst, during the course of interviews, these individuals made statements that were decidedly unhelpful to the defense of Hunka Bunka.  He determined, based on his experience as a trial lawyer in New Jersey,

---

[13] Janice Bierman, Wellinghorst's law firm colleague, actually handled the arbitration.

that they would make very poor witnesses. He testified that he did not want Halpern, Femia's very experienced attorney, "anywhere near" those witnesses during a trial.

The court finds Wellinghorst very credible, even though he testified at trial by videotaped deposition. Of course, given the nature of Lloyd's allegations and defenses in this case, Wellinghorst presumably had an interest in defending his professional reputation by trying to establish that he competently handled Hunka Bunka's defense. That said, there is nothing in the record to suggest that First Specialty, Ward, or Hunka Bunka, or anybody else for that matter, ever has made or even had threatened to make any sort of a legal malpractice claim against Wellinghorst. In short, Wellinghorst had no apparent ax to grind in this case. He was <u>never</u> meaningfully impeached or challenged during his lengthy testimony.[14] Having had the opportunity to observe Wellinghorst's appropriately confident and forceful demeanor, and just as importantly having had the opportunity to consider the substance of the very detailed matters about which he testified, the court was left with the definite impression that Wellinghorst is well-credentialed and very experienced. More importantly, he seems endowed with sound judgment and common sense with regard to strategic, tactical, and procedural issues in modern litigation. To put this in context, the court formed the impression that Wellinghorst's skills as a trial lawyer are generally on par to those

---

[14] Wellinghorst probably was the most important witness among the fourteen who testified during the trial of this case. Lloyd's cross-examination of this critical and obviously challenging witness was assigned to a fairly young and inexperienced lawyer — with predicable results. This is ironic in light of the criticisms leveled by Lloyd's against Wellinghorst with regard his handling of the underlying litigation.

actually exhibited by the fine lawyers who represented First Specialty, Lloyd's and Ward in the instant coverage litigation.

The court further finds that Wellinghorst used the above-described skills to do a reasonable and competent job in defending Hunka Bunka in a case that presented very few, if any, viable defense opportunities on the primary issues of liability and damages. The court, however, has no illusions that Wellinghorst did an outstanding job, let alone a "perfect" job, with his defense of Hunka Bunka.

Actually, it was Wellinghorst who discovered Ward's mistake with regard to the date of loss and policy coverage issue. He could have remained silent upon that discovery in an effort to avoid the instant litigation. But instead he did the right thing by notifying Ward.

After Elliston was notified of the Femia claim in March 2003, Ward and Wellinghorst continued to vigorously defend Hunka Bunka. Wellinghorst's billing records (Exhibit 38) indicate that, from that point forward, he received and reviewed photographs of Femia; corresponded with an investigator to locate and take statements of plaintiff's witnesses; prepared and attended the depositions of Femia's friends and witnesses (Beckler and Bivona); attended court hearings regarding adjournment of the trial date; continued to correspond with Ward and Halpern; and engaged in settlement negotiations.

D.      Summary of the Two Insurers' Handling of the Femia Claim.

The list of things that First Specialty, Ward, and Wellinghorst did in the course of defending Femia's suit against Hunka Bunka is relatively long. That list may not have been

as long, as comprehensive, or as swiftly completed as Lloyd's believes it should have been, but it is still a relatively long list.

In stark contrast, the list of things that Lloyd's and Elliston did upon notification of the Femia claim is very short.  In sum, from April 22, 2003, when Van Pelt wrote to O'Quain and rejected the tender of Hunka Bunka's defense, Elliston and Lloyd's did virtually nothing of significance to try to investigate the Femia claim or otherwise protect the interests of the insured, Hunka Bunka.  Elliston did not contact Halpern to explain the coverage dispute and seek to determine if he and Femia would object to allowing additional time for discovery; Lloyd's just assumed that Halpern would have refused, realizing that he had Hunka Bunka and its insurers "over a barrel."  Nor did Elliston approach the court, even conditionally, to seek relief from the existing discovery deadlines in the Femia suit, or attempt to have the trial settings adjourned.  Elliston did not interview any witnesses to Femia's attack.  Elliston never contacted Hunka Bunka or any of its employees regarding the Femia claim.  Although Elliston retained outside coverage counsel to provide advice, Elliston did not retain counsel to associate with Wellinghorst in the defense of Hunka Bunka, or to assume the defense from Wellinghorst.  Strangely, it did not even occur to Van Pelt and Elliston to ask for contemporaneous copies of correspondence between Ward and Wellinghorst.  Most notably, Elliston and Lloyd's elected not to participate in the defense of Hunka Bunka under a reservation of rights.

During trial, in response to an inquiry by the court, Lloyd's essentially stipulated that its efforts were limited to periodically asking Ward for certain information; making certain

suggestions to Ward; retrieving one of its own claim files on another incident involving Hunka Bunka from the same evening in question; and hiring coverage counsel for advice and to review Wellinghorst's file.  These concededly limited efforts that Elliston and Lloyd's made were almost exclusively aimed toward trying to shore up the position staked out in Van Pelt's April 22, 2003-letter, which as earlier indicated was essentially written by coverage counsel.  While the court is sympathetic to Elliston's concerns upon receiving late notice of the Femia claim, the court finds that Elliston's course of action during the weeks that followed was at worse illogical, and at a minimum unreasonable.

Wellinghorst gave Elliston and Lloyd's ample and repeated opportunities to step in and handle (or at least assist) in Hunka Bunka's defense.  Specifically, he asked Elliston and Lloyd's to participate in a joint settlement of the Femia claim with the understanding that the insurers could resolve their coverage dispute later.  But Elliston and Lloyd's declined.

Dana Shay, a claims adjuster at Ward, testified at length during trial about Ward's handling of the Femia claim and lawsuit, Lloyd's response, and Ward's claims handling procedures.  She did not become personally involved in handling the Femia claim on behalf of Ward until June 2003; Shay took over the claim file from O'Quain, who had moved to Louisiana. The court finds Shay to be competent and credible.  She was quite candid and willing to acknowledge Ward's obvious mistake regarding coverage for the Femia claim.

Janet Van Pelt, the Elliston claims adjuster assigned to the Femia claim, testified at trial about Elliston's handling of the Femia claim.  Like Shay, the court finds Van Pelt to be credible, at least in the sense that her credibility was never directly impeached in any

meaningful way.  Van Pelt obviously is knowledgeable regarding the insurance industry.
Most of Van Pelt's testimony, however, struck the court as a bit too artfully phrased and
rehearsed.  Instead of giving truly responsive answers to anticipated questions posed by
opposing counsel (and some apparently unanticipated ones posed by the court), Van Pelt
seemed intent on framing her answers so they were technically in accord with the position
taken in her April 22, 2003 letter.  If that actually was her intent, she "succeeded."

Van Pelt is somewhat more experienced as a claims adjuster than Shay.  After hearing
lengthy testimony from both, the court finds in this particular case that, without a doubt, Shay
was much more action-oriented than Van Pelt.

The court is mindful and respectful of the need for business persons to properly
document (or "paper") their files.  The claims personnel at Ward and Elliston *both* did so in
this case, which is neither unusual nor surprising.  But still, here it seems that Elliston was
far more concerned about papering its file than making any genuine attempt to step in to
solve a problem under admittedly challenging circumstances.

E.   New Jersey's *Best Practices* Rules.

Under the New Jersey Court Rules that were promulgated by the New Jersey Supreme
Court in 2000 (also known as "Best Practices"), different types of cases were assigned to one
of four "tracks."  Each track had a limit on the time allowed for discovery.  The Femia
personal injury suit was placed in Track II, which provided 300 days for discovery from the
date the answer is filed or ninety days after the first defendant was served, whichever
occurred first.

Discovery in the Femia case was technically set to end on September 10, 2002. Exhibit 628.  However, the evidence at trial was essentially uncontroverted that the parties continued to conduct discovery through the summer of 2003, including depositions of Femia, Beckler, Bivona, and DiComo.  Exhibits 659, 85, 87, & 81, respectively.

As earlier indicated, prior to September 10, 2002 (the formal discovery cutoff date), Wellinghorst filed an answer to the Femia complaint (Exhibit 1); requested police reports from the Sayreville Police Department (Exhibit 35); propounded and secured answers to interrogatories (Exhibits 2 & 42); obtained Femia's hospital records (Exhibit 66); and issued a notice for Femia's deposition (Exhibit 76).

Significantly, Halpern never objected to any of the discovery that was requested by Wellinghorst on behalf of Hunka Bunka, regardless of any time limitations imposed by Best Practices.  Despite Lloyd's speculation, there simply is no credible evidence in the record to support the notion that Halpern or the court in the Femia case would have sought to strictly enforce Best Practices had Lloyd's decided to become involved in Hunka Bunka's defense in the spring and summer of 2003.  Nor is there any credible evidence in the record that Halpern or the presiding judge would have moved at trial to strike any discovery taken on behalf of Hunka Bunka after the Best Practices discovery deadline.

F.     Femia's Injuries and the $445,000 Settlement.

There can be no question that Femia was very seriously injured as a result of the attack he suffered while a patron at Hunka Bunka.  Exhibits 11, 96, & 139 (photographs); Exhibits 66, 71, & 642 (medical records).

On behalf of First Specialty, and with First Specialty's authority, Ward ultimately agreed to settle Femia's case for $445,000, an obviously significant sum of money.  A major argument made by Lloyd's at trial in this regard, however, was that First Specialty and Ward had decided not to take the Femia case to trial under almost any circumstances (which is true), and further they basically conspired to pay whatever it took to settle the Femia case with the intent of dumping that settlement on Lloyd's.  Specifically, Lloyd's argues that the Femia case was worth only about $200,000, and that no meaningful effort was made to negotiate a good-faith settlement along those lines.

It must be noted here that Lisa Ott, a claims adjuster at Ward, instructed Wellinghorst on January 23, 2003 to reject the $175,000 arbitration award, in light of the lack of documentation in the file regarding the extent of plaintiff's injuries.  Exhibit 167A, p. 71. Wellinghorst responded that the plaintiff's injuries were more extensive than originally thought, and he filed for a "trial de novo," thereby rejecting the award, in February 2003. Exhibit 167A, p. 72.  Halpern also timely attempted to file for a trial de novo, but his filing was rejected by the court because of Wellinghorst's prior filing.  Exhibits 3 and 30.

O'Quain initially valued the Femia case at $200,000-250,000.  She later noted that $250,000 would be a good settlement as it would not be in Hunka Bunka's best interest to get the case before a jury.  *See* Exhibit 167A, p. 81.

Despite Lloyd's assertions, the record suggests that the $445,000 settlement, although arguably a bit on the high side, was reasonable under the circumstances.  For example, prior to settling Femia's claim against Hunka Bunka, Wellinghorst provided research to Ward

concerning jury verdicts in other New Jersey cases alleging bodily injury arising out of altercations in bars or restaurants.  Those verdicts ranged from $100,000 to $1 million.  Exhibit 12.  Significantly, Wellinghorst's research was consistent with the valuation of the case by Halpern, who testified the Femia case was worth *more than* $445,000, and possibly more than $1 million.  But, testified Halpern, Femia wanted to accept the $445,000 settlement offer.

The court found Halpern's videotaped deposition testimony at trial to be quite credible.  He appears to be a very savvy plaintiff's attorney in New Jersey and was the only witness in this case with absolutely no interest in the outcome.  He testified that the Femia case was reasonably well-defended by Wellinghorst and that the settlement was negotiated at arm's length.  He stated that Wellinghorst did a capable job in all respects and that as far as he was concerned the case was handled no differently than his other cases.

As established in the record by both Wellinghorst and Shay, and as appreciated by any lawyer or judge who has handled more than a few trials, valuing a case for settlement purposes is more akin to a judgment-based "art" than anything remotely resembling an empirical "science."  Having considered all of the evidence, the court finds that the $445,000 settlement ultimately reached was reasonable, that it was the result of good faith negotiations, and that Wellinghorst, Ward, and First Specialty did not allow the dispute with Lloyd's to result in an "over-payment" to Femia.

G.      The *Pizzulli* Claim and its Significance to Lloyd's Claim of Prejudice.

Implicit in Lloyd's contention that it was prejudiced by late notice of Femia's claim is the hypothesis that, *if* Lloyd's had received timely notice, Elliston would have done a much better job as Lloyd's TPA investigating the claim than Ward did on behalf of First Specialty. This hypothesis, however, is unsupportable given the trial record.

Coincidentally, another Hunka Bunka patron, Michael Pizzulli, was injured on the same evening that Femia was attacked. There was considerable evidence at trial to the effect that the same group of assailants attacked both Pizzulli and Femia.

Elliston, in its capacity as Lloyd's TPA, was timely notified of Pizzulli's claim on September 5, 2001. Elliston eventually settled the claim on Lloyd's behalf for $20,000 on December 1, 2003. Exhibit 151.

An adjuster at Elliston other than Van Pelt was primarily responsible for adjusting the Pizzulli claim. Nevertheless, Van Pelt did in fact review Elliston's Pizzulli file sometime during March or April 2003, and copies of certain documentation concerning Femia's attack were in that file. She failed to "connect the dots." As a result, Van Pelt failed to timely forward to Ward or Wellinghorst copies of any of the investigative materials from the Pizzulli file that presumably would have been very useful in the defense of the Femia case.[15]

---

[15] Here again, this is ironic in light of the vitriolic assertions by Lloyd's, Elliston, and Van Pelt concerning Ward's purportedly lax approach to adjusting the Femia claim, and particularly ironic in light of the assertion that the tender of Hunka Bunka's defense to Lloyd's was inherently prejudicial because it was made so close to trial. If time truly was of the essence as suggested in Van Pelt's initial correspondence in March 2003, then presumably she would have been sensitive to the need to provide Ward and Wellinghorst a copy of the Pizzulli file immediately.

Among other things, Elliston had access to Pizzulli's February 7, 2003-deposition transcript. Exhibit 122.

When Van Pelt finally did connect the dots (or at least when she disclosed the fact of the Pizzulli claim to Ward several weeks later, on or about June 20, 2003) (Exhibit 142), she still did not actually provide a copy of the claim file.  Ward understandably was upset by the late disclosure and claimed that Hunka Bunka and First Specialty were being prejudiced by Lloyd's conduct, instead of the other way around.  Exhibit 100.  And not surprisingly, Wellinghorst testified that he too was quite upset about Lloyd's untimely disclosure.

Upon review of the Pizzulli claim file and Elliston's handling of that claim, the court finds that it borders on disingenuous and hypocritical for Elliston to cast *any* aspersions on Ward's handling of the Femia claim.  Even though the ultimate settlement amounts suggest that the Femia's claim was much more serious than Pizzulli's, the evidence presented at trial as a whole strongly suggests that, even if Elliston had received notice of the Femia claim in March 2001 instead of March 2003, Elliston would have done no better a job investigating the claim or defending Hunka Bunka than Ward and Wellinghorst did.

Many of the specific actions (or more precisely, the inactions) that Lloyd's complains about with regard to Ward's and Wellinghorst's handling of the Femia claim find their mirror images in Elliston's handling of the Pizzulli claim.[16]  This, of course, cuts against Lloyd's

---

[16] As with Ward and its handling of the Femia claim, the record is very thin as to whether Elliston's handling of the Pizzulli claim is representative of how it generally adjusts claims for Lloyd's and other insurers.

argument that the rights Lloyd's claims were lost as a result of late notice were actually substantial.  As just two notable examples, the evidence suggests that fifteen months after Elliston first received the Pizzulli claim, Elliston still did not have statements from any witnesses, and did not even have a copy of the police report on the occurrence.  Because there is no reason to believe that Ellison would have acted differently than Ward did if had received timely notice of the Femia claim, the court finds that there is no causal link between the late notice and Lloyd's claimed prejudice.[17]

The bottom line is this:  The court finds that Ward and its retained defense counsel (Wellinghorst) did a reasonably competent job (certainly not a stellar job, but a competent one nonetheless) adjusting and defending the Femia claim.  But even assuming for the sake of discussion that the court were to find that Ward was incompetent in adjusting Femia's claim, then the court would logically be compelled, at least based on the limited evidence in the trial record, to find that Elliston was equally incompetent in adjusting Pizzulli's claim. For the sake of First Specialty and Lloyd's, and more importantly for the sake of their respective insureds who pay premiums for CGL coverage, the court chooses to infer that *neither* Ward nor Elliston are incompetent.

---

[17] *See Hatco v. W.R. Grace & Co.*, 801 F. Supp. 1334, 1372 (D. N.J. 1992) (with respect to an insurer's argument that late notice caused prejudice by precluding the insurer from conducting a contemporaneous investigation, the court found that "[a]lthough if [the insured] sent its notice six years earlier [the insurer] would have had an 'opportunity' to preserve testimony and documents, there is little or no reason for the Court to believe that [the insurer] would actually have done so. . . . [the insurer] has not established beyond dispute that [the insured]'s delay was the cause of any prejudice to [the insurer]").

The parties agree that it is important and desirable for an adjusting company to thoroughly investigate and evaluate a claim and then try to settle it for a reasonable amount as soon as possible. However, in the case at bar, it is critical to bear in mind that, by the time Femia first asserted his claim (February 2001), more than ten months already had passed since the subject occurrence. *No* fresh evidence was available when Ward first received notice of the claim. It follows that no fresh evidence would have been available to Elliston and any lawyer it may have hired to represent Hunka Bunka.

Clearly, Lloyd's was placed in a less than ideal position by the late notice of the Femia claim. The evidence at trial, however, simply does not support the assertion that Lloyd's irretrievably lost substantial rights as a result of late notice of the Femia claim. Indeed, the evidence strongly suggests that, had Elliston *actively* intervened in March 2003, and it definitely could have done so under a reservation of rights, it still would have been able to investigate, defend, and/or settle the Femia case without significant impediment.

During trial, Lloyd's argued that the precise sequence of the Pizzulli and Femia attacks would make a significant difference in Hunka Bunka's liability exposure on the negligence claim in the Femia suit. Specifically, Lloyd's argued that, *if* the Femia fight occurred *first*, presumably there could be no finding that Hunka Bunka violated its own security policy by failing to remove individuals involved in altercations. Lloyd's further asserted that Wellinghorst failed to effectively develop and exploit purported inconsistencies in the testimony of Femia's friends about the sequence of the two fights.

04-2359-JPO-trial.wpd

27

Arguably, Wellinghorst could have done a better job in this regard.  But the clear weight of the evidence suggested that Femia was attacked *after* Pizzulli.  In any event, Lloyd's argument totally overlooks the fact that, as testified to by both Shay and Wellinghorst, *irrespective* of the sequence of the fights, the prospects of successfully defending Hunka Bunka were quite doubtful – because the nightclub had a checkered history of altercations, a less than favorable reputation among the community from which any jury would be selected,  and because of the apparently callous attitude of its bouncers with regard to the need to prevent such altercations.

During trial, Lloyd's also suggested that Ward and Wellinghorst failed to exploit substantial evidence that blood tests taken from Femia at the hospital showed that he probably was very intoxicated when he was attacked.  Here, Lloyd's theory is that such evidence would have helped diffuse Femia's story that he was attacked without provocation. Shay and others explained, however, that such a theory of "defense" probably would have backfired were the Femia case tried instead of settled, as Halpern would have countered by showing that Hunka Bunka continued to sell alcoholic drinks to an obviously intoxicated patron.

Notably, Lloyd's did not call a security expert in the instant insurance case to testify as to Hunka Bunka's liability or lack thereof in the Femia matter.  If there truly was a viable defense that could have been mustered in the underlying case, that could have been presented in the instant case.  Regardless, the court finds that Lloyd's did not have a likelihood of

success in defending Hunka Bunka in the Femia matter, because Hunka Bunka's liability was clear, and because exposure to a large damages verdict was equally clear.

With the benefit of 20-20 hindsight, it is relatively easy to opine how any case could be prepared for trial and tried more effectively.  For example, in the case at bar, better experts could have been retained; more concise, hard-hitting briefs could have been filed; witness interrogations could be more logically organized and efficiently executed; exhibits could have been better culled out, organized, and retrieved during trial; video presentation technology could be better utilized to maximize visual impact; etc.  Many other examples could be cited, even though the court hastens to add that the instant case was intensely, thoroughly, and professionally litigated by First Specialty, Lloyd's, and Ward, and their respective trial counsel.  The point here is simply that the court's ability to pontificate after the fact about what the parties or counsel "could have" or "should have" done does not reasonably lead to the conclusion that any of them did a poor job.  And likewise, Lloyd's mere assertion that First Specialty, Ward, and Wellinghorst could have or should have done some things differently or better in the Femia litigation does not mean that any of them did a poor job, nor does it mean that a better job would have resulted in an ultimate settlement of an amount materially less than $445,000.

H.    Damages.

The court finds that, as a result of Elliston's and Lloyd's inaction, First Specialty sustained damages in the amount of $471,021.68.  Most of this is attributable to the $445,000.00 paid to settle Femia's claim and suit.  The remaining $26,021.68 relates to

attorneys' fees and expenses paid by First Specialty to Wellinghorst for Hunka Bunka's defense. Exhibit 38. The court finds these fees and expenses were reasonable (and Lloyd's has never suggested otherwise).

I.      Miscellaneous Credibility Findings.

The court already has made specific credibility findings with respect to Wellinghorst, Halpern, Shay, and Van Pelt, who were the four most significant witnesses during trial. Given the fiercely litigated history of this case, further proceedings seem inevitable. Therefore, for the benefit of the record on appeal, the court will proceed to address the credibility of each of the parties' other ten witnesses.

First Specialty, Lloyd's, and Ward each called a retained expert witness to testify at trial on the issue of whether Lloyd's was prejudiced by late notice of the Femia claim. None were credible, i.e., their testimony did very little to meaningfully inform the discussion of the issues at hand.

Jeffrey Stempel was called as First Specialty's expert, and of course he testified that Lloyd's was *not* prejudiced by late notice of the Femia claim. Stempel is a full-time law professor at the University of Nevada-Las Vegas.[18] He seems generally well-versed in the law (*see* Exhibit 300C), and appears to be fairly knowledgeable about insurance law in particular. Nonetheless, the court finds that the opinions to which he testified were largely cumulative, conclusory, and unpersuasive. Although the court denied Lloyd's pretrial

---

[18] Interestingly, though, Stempel admits that a large percentage of his annual income comes not from teaching law but rather from testifying for hire in lawsuits like this one.

*Daubert* motion to exclude Stempel's testimony (*see* doc. 336, pp. 6-9), the court did so when the parties were planning to impanel an advisory jury on First Specialty's equitable subrogation claim against Lloyd's.  In addition to being cumulative and conclusory, the basic problem with Stempel's testimony is that it was based more on theory than anything even remotely approaching practical, hands-on experience.

George Kenny was called as Lloyd's expert, and he predictably testified that Lloyd's *was* prejudiced by the late notice of the Femia claim.  Kenny is a very experienced lawyer from New Jersey.  *See* Exhibit 761.  As with Stempel, the court denied a pretrial *Daubert* motion to exclude Kenny's testimony (doc. 366, pp. 9-11).  And like Stempel, Kenny's opinions during trial were unpersuasive because they were largely cumulative of the evidence in the record.  Further, even on direct examination, while remaining unfailingly polite and respectful, Kenny tended to give long-winded, non-responsive answers to narrowly drawn questions, which seriously hurt his credibility.  His testimony about Best Practices seemed largely theoretical; and even he admitted that there is a marked distinction between what the new New Jersey rules technically said about discovery deadlines versus how they actually would be enforced in practice.

Curtis Meanor testified as Ward's expert, by deposition.  *See also* Exhibits 301A and 301B (Meanor's letter reports).  Meanor's testimony provided some welcome comic relief in an otherwise dry case (concerning why he left the federal bench several years ago and

returned to private practice).[19]  But he did even less to inform the discussion than Stempel and Kenny.  Meanor seemed pretty out of touch with the hands-on aspects of modern litigation.  His assertion that Wellinghorst actually did *more* than was needed in defending Hunka Bunka was wholly unpersuasive.

As earlier indicated, Rochelle Gizinski is the New Jersey private practice attorney who presided over the mandatory, non-binding arbitration in the Femia suit.  She was called by First Specialty as a fact witness to testify at trial about the non-binding arbitration process in New Jersey.  She seems reasonably experienced in her specific area of practice.  She has tried a large number of cases, but few if any of those cases were as significant as Femia's case against Hunka Bunka.  Gizinski conceded that, due to the high-volume, abbreviated nature of the non-binding arbitration hearing process in New Jersey, she went into (and came out of) the Femia arbitration with very little in the way of specific information.  Much like Stempel, Kenny, and Meanor, the court did not find her testimony to be of much help to the issues at hand, especially since it is uncontroverted that *both* parties to the underlying lawsuit desired to reject the arbitration award, rendering the amount of the award moot.

Jeffrey Lauersdorf, who is a licensed Kansas attorney, testified as First Specialty's corporate representative.  Although Lauersdorf is a claim vice-president, he was unfamiliar with many of the relevant details of the Femia claim.  But, he credibly corroborated the

---

[19] Meanor Depo., doc. 419, 14:24-17:17.

testimony of Wellinghorst, Halpern, and Shay that the $445,000 settlement was negotiated at arms length.

Kip Connor, president and partial owner of Hunka Bunka, testified by videotaped deposition.  In addition to explaining why Hunka Bunka notified Connolly of the Femia claim, Connor testified that he was generally satisfied with Wellinghorst's defense of Hunka Bunka, even though he felt $445,000 may have been a large amount of money to settle Femia's case.  The court found his testimony generally believable, but still cumulative.

Thomas Stackhouse testified by videotaped deposition as Connolly's corporate representative.  In light of Lloyd's stipulation during trial that there is no issue in this case as to the source of notice to Lloyd's (i.e., as earlier indicated, the dispositive question is whether Lloyd's was prejudiced by late notice), this testimony was largely immaterial.

Frances Lake-Black was a "temp" who worked at Ward and who initially adjusted the Femia claim and who negligently failed to investigate and determine that First Specialty had no obligation to defend the Femia claim.  Her deposition testimony, as presented during trial, reveals that she remembered very little about the facts associated with the handling of the claim.  The court did not find her testimony persuasive.  However, the fact that Ward evidently delegated such important work to such incompetent persons does not reflect well on how Ward performs its TPA functions for insurers like First Specialty.

Herbert Sweetow was another "temp" worker who did adjusting work at Ward in 2001.  The court finds that his designated written deposition testimony as to standard operating procedures in the insurance industry was cumulative.

Raymond Tytler is a claims manager at St. Paul Travelers Syndicate Management, Ltd. ("St. Paul"),[20] the managing agent for Lloyd's on policies with American insureds. He testified by videotaped deposition. Tytler, even more so than Van Pelt, seemed intent on preserving litigation positions rather than truly answering questions. He lacked credibility in the eyes of the court.

## IV.   Conclusions of Law

Based on and in light of the foregoing findings of fact, the court draws the following conclusions of law:

A.     Breach of the Notice Provision in the Lloyd's Policy.

In construing notice provisions of insurance policies, New Jersey courts have rejected "a classical contract approach that would have enforced strictly the terms of the policy as written, and instead stated that the contract should be read in accordance with the reasonable expectations of the insured '*so far as its language will permit*.'" *Gazis v. Miller*, 186 N.J. 224, 892 A.2d 1288, 1280 (2006) (quoting *Cooper v. GEICO Ins. Co.*, 51 N.J. 86, 237 A.2d 870, 873 (1968) (emphasis added)). Viewing the Lloyd's policy as a whole, and based on all the evidence, the court finds as a matter of law that, under the Lloyd's policy, Hunka Bunka (or at least somebody on its behalf) was contractually required to promptly notify Mavon after Hunka Bunka became aware of the Femia claim. The failure to do so

---

[20] St. Paul was a named defendant in this case and shared counsel of record with Lloyd's and Elliston. However, without opposition by First Specialty, the claims against St. Paul were dismissed by summary judgment order entered on March 9, 2006 (doc. 189).

constituted a material breach of the notice provision of the Lloyd's policy, even construing the notice provision in accordance with the reasonable expectations of the insured.[21]

B.      Equitable Subrogation.

Under New Jersey law, "subrogation is an equitable rather than a contractual doctrine applied in the interest of justice when one party who is not a volunteer pays an obligation which should be imposed on another. . . . A payor is not a volunteer if it is acting under compulsion to protect its own interests" *See Jorge v. Travelers Indemnity Co.*, 947 F. Supp. 150, 155 (D. N.J. 1996).[22]  In defending and settling the Femia claim against Hunka Bunka, First Specialty was not a volunteer, as it was at least in part protecting its own interests.  The evidence at trial was uncontroverted that, regardless of whether Lloyd's properly rejected First Specialty's tender of the defense of Hunka Bunka, First Specialty was essentially "stuck between a rock and a hard place."  That is, under New Jersey law and the facts presented, even Lloyd's witnesses conceded during trial that First Specialty could not abandon Hunka

---

[21] As earlier indicated, the court so holds despite its previous statement in the order denying First Specialty's motion for summary judgment that "[a] review of the notice provision of [the Lloyd's policy] reveals that it is rather ambiguous on its face."  Doc. 214, p. 11.  With the benefit of the entire trial record, as contrasted with a limited summary judgment record, the court is now persuaded that the Lloyd's policy must be reasonably construed to require Hunka Bunka to notify Mavon.

[22] "In the insurance context, the Tenth Circuit has held that the liability of an insurer need not be 'ironclad' in order for it to settle a claim without a subsequent finding that the payment to the insured was voluntary. . . .'a payment is not voluntary if it is made with a reasonable or good faith belief in an obligation or personal interest in making that payment.'" *Jorge*, 947 F. Supp. at 156 (citing *Weir v. Fed. Ins. Co.*, 811 F.2d 1387, 1395 (10th Cir. 1987)).

Bunka after Lloyd's refused to assume Hunka Bunka's defense.  First Specialty defended Hunka Bunka and settled the Femia claim with a reasonable and good faith belief that First Specialty was estopped to deny coverage (not estopped by Lloyd's, but rather estopped by Hunka Bunka).  *See Griggs v. Bertram*, 88 N.J. 347, 443 A.2d 163, 167 (1982) (carrier undertaking to defend suit against its insured with knowledge of facts that are relevant to policy defense or basis for noncoverage without a reservation of rights is estopped to later deny coverage).

For an insurance company under New Jersey law to avoid providing coverage to its insured, "there must be proof that the notice provision of its policy was breached, and that is was appreciably prejudiced thereby."  *Morales v. Nat'l Grange Mut. Ins. Co.*, 176 N.J. Super. Ct. Law Div. 347, 423 A.2d 325, 327 (1980).  Most of the cases cited by First Specialty and Lloyd's do *not* involve disputes exactly like the one at bar, where one insurer mistakenly assumes the defense of the insured and then sues another insurer who actually owed coverage for indemnification.  *See Cooper*, 237 A.2d at 874 (holding, in an action by insureds under an automobile liability policy, that "the carrier may not forfeit the bargained-for protection unless there are both a breach of the notice provision and a likelihood of appreciable prejudice"); *Morales*, 423 A.2d at 327 (in action against automobile insurer by holder of default judgment obtained against insured, citing *Cooper* for proposition that "for an insurance company to escape liability, there must be proof that the notice provision of its policy was breached, and that it was appreciably prejudiced thereby"); *Vornado v. Liberty Mut. Ins. Co.*, 106 N.J. Super. Ct. Ch. Div. 111, 254 A.2d 325, 328 (1969) (applying

appreciable prejudice standard in action with facts similar to the instant case - one insurer assumed the defense of the insured due to a mistake regarding the date of loss and the insurer whose policy actually covered the date of loss sought to avoid providing a defense to the insured on the basis of late notice); *Molyneaux v. Molyneaux*, 230 N.J. Super. Ct. App. Div. 169, 553 A.2d 49, 51 (1989) (declaratory action brought by insurer to resolve issue of liability to insured, and affirming trial court's holding that insurer had to prove appreciable prejudice to avoid coverage); *Kitchnefsky v. Nat'l Rent-A-Fence of Amer., Inc.*, 88 F. Supp. 2d 360, 366, 368 (D. N.J. 2000) (applying appreciable prejudice standard in action by insured corporation and insured's excess carrier for indemnification by primary insurer for payments made to injured employee of coinsured pursuant to settlement of negligence action); *Gazis*, 892 A.2d at 1281 (applying appreciable prejudice standard to excess automobile liability insurer).  Nonetheless, Lloyd's pleaded defense of "appreciable prejudice" was addressed in each of the three parties' summary judgment motions and supporting memoranda (*see* docs. 191, 192, 194, 195, 196, and 197), and it was the main focus of the parties' presentation of the case at trial.  The court finds that the rationale for applying the appreciable prejudice standard that was articulated by the New Jersey Supreme Court in *Cooper* and its progeny (protection of the insured) applies with equal force to the instant case between two insurers.

Lloyd's argues that the standard that should be applied in this case is not whether it actually suffered appreciable prejudice, as articulated in *Morales*, but whether there was a likelihood of appreciable prejudice, as articulated by part of the opinion in *Cooper*.  This potentially very important distinction unfortunately is not terribly clear from the cited

precedents.  Hopefully it will be made more clear in the near future by the New Jersey Supreme Court.  As earlier indicated, this federal judge sitting in Kansas is exercising diversity subject matter jurisdiction and is charged with applying the substantive law of New Jersey.  Out of deference to New Jersey's state and federal courts, this judge respectfully declines to definitively resolve the above-described issue, because it is unnecessary to adjudicate the case at bar.  That is, based on the evidence presented in this case, and for the reasons explained in more detail below, this court finds that Lloyd's suffered neither actual prejudice nor a likelihood of prejudice as a result of the late notice of the Femia claim. Indeed, any prejudice that Lloyd's suffered here was *de minimis*.

"The burden of proof of [appreciable] prejudice is on the carrier [in this case, Lloyd's].  In determining whether appreciable prejudice exists, each case must turn on its own facts." *Morales*, 423 A.2d at 327.  The two factors generally considered by New Jersey courts in resolving whether appreciable prejudice exists are (1) "whether substantial rights have been irretrievably lost by virtue of the failure of the insured to notify the carrier in a timely fashion" (*Id*. at 329; *Kitchnefsky*, 88 F. Supp. 2d at 368); and (2) "the likelihood of success of the insurer in defending against the accident victim's claim" (*Morales*, 423 A.2d at 330; *Kitchnefsky*, 88 F. Supp. 2d at 368).  For the factual reasons explained at length in sections III(B)-(G) above, the court finds as a matter of law that Lloyd's did not irretrievably lose substantial rights by virtue of the late notice.  The court further finds that Lloyd's did not have a likelihood of success in defending Hunka Bunka against Femia.

Despite its *perceived* prejudice from late notice of the Femia claim, Lloyd's had no legitimate basis to deny coverage to Hunka Bunka.  First Specialty therefore is entitled to recover the amounts it paid in connection with the defense and settlement of the Femia claim.

C.      First Specialty's Alternatively Pleaded Claim Against Lloyd's for Unjust Enrichment.[23]

"To establish unjust enrichment, a plaintiff must show both that defendant received a benefit and that retention of that benefit without payment would be unjust."  *VRG Corp. v. GKN Realty Corp.*, 135 N.J. 539, 641 A.2d 519, 554 (1994) (citations omitted).  For essentially the same reasons that the court concludes that First Specialty is entitled to equitable subrogation from Lloyd's, the court concludes that Lloyd's was unjustly enriched by First Specialty's defense and settlement of the Femia claim.

D.      Lloyd's "Other Insurance" Argument.

As a fall-back position, Lloyd's argues that, even if the court finds that Lloyd's was not prejudiced by the late notice, then Lloyd's can be held liable for no more than half of the $445,000 Femia settlement amount because the "other insurance clauses" in the First Specialty and Lloyd's CGL policies are either mutually enforceable or mutually repugnant. The court respectfully rejects this argument.

First, Lloyd's did not preserve its purported "other insurance" defense in the excruciatingly detailed final pretrial order filed on March 20, 2006 (doc. 190).  Lloyd's

---

[23] First Specialty also preserved a claim for bad faith in the pretrial order.  But this claim was not addressed at trial, and thus the court considers it effectively abandoned.

raised this issue for the first time more than ten months later in a brief filed in late October 2006, just a few weeks before trial (doc. 288, pp. 4-6).  And, no motion has been made by Lloyd's to modify the pretrial order in this respect.

The court finds that Lloyd's has waived the above-described argument by failing to preserve it in the pretrial order.  *See Cortez v. Wal-Mart Stores, Inc.*, 460 F.3d 1268, 1276 (10th Cir. 2005) ("'claims, issues, defenses, or theories of damages not included in the pretrial order are waived . . . .") (quoting *Wilson v. Muckala*, 303 F.3d 1207, 1216 (10th Cir. 2002)).  *See also* doc. 190, pp. 1-2 (The pretrial order "shall supercede all pleadings and control the subsequent course of this case.  It shall not be modified except by consent of the parties and the court's approval, or by order of the court to prevent manifest injustice." (citing Fed. R. Civ. P. 16(e); D. Kan. Rule 16.2(c))).

First Specialty has not consented to any modification of the pretrial order.  Indeed, First Specialty has strenuously objected to Lloyd's last minute assertion of the "other insurance" defense.  Nevertheless, for the sake of the record on appeal, the court will address this argument very briefly.

The "Other Insurance" clauses in the Lloyd's and First Specialty policies state that:

> If other valid and collectible insurance is available to the insured for a loss we cover under Coverages A or B of this Coverage Part, our obligations are limited as follows:
>
> a.    Primary Insurance
>
> This insurance is primary except when b. below applies [which describes the circumstances under which this insurance is excess over any other insurance].  If this insurance is primary, our

obligations are not affected unless any of the other insurance is also primary.  Then, we will share with all that other insurance by the method described in c. below.

. . .

c.      Method of Sharing

If all of the other insurance permits contribution by equal shares, we will follow this method also.  Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits.  Under this method, each insurer's share is based on the ration of its applicable limit of insurance to the total appreciable limits of all insurers.

Reading the above-described clause from the perspective of the Lloyd's policy, the court finds that Lloyd's insurance is "primary."  That means that Lloyd's obligations under the policy are not affected unless the First Specialty insurance also is primary.  Based on the facts presented in this case, the court is unpersuaded that First Specialty's insurance somehow became primary for the Femia claim merely by virtue of the fact that First Specialty *mistakenly* assumed the defense of Hunka Bunka.  Thus, this clause in the Lloyd's policy does not operate to prevent the court from holding Lloyd's accountable for 100% of the Femia settlement amount.

Conversely, reading the above-described clause from the perspective of the First Specialty policy, the court finds that it does not apply to the Femia claim.  It only would limit First Specialty's obligations if other insurance were available to the insured for a loss that

First Specialty covers under its policy.  Here, there is no dispute that the Femia incident occurred outside the First Specialty policy.  Thus, this clause in the First Specialty policy does not operate to prevent the court from holding Lloyd's accountable for 100% of the Femia settlement amount.

Alternatively, Lloyd's cites *Sonoco Prods. Co., Inc. v. Fire & Cas. Ins. Co.*, 337 N.J. Super. Ct. App. Div. 568, 767 A.2d 1018, 1023 (2001), for the proposition that when other insurance provisions are virtually identical, they are deemed mutually repugnant and the duty to indemnify is then divided between the two carriers.  In this case, based on the evidence and briefs submitted, the court fails to see how the clauses in the Lloyd's and First Specialty CGL policies may *reasonably* be construed as mutually repugnant.  Although they are identical, they merely call for equal apportionment of the loss in situations where there are two primary insurers.  The court finds as a matter of law that the "mutually repugnant" rule does not apply to the circumstances in the case at bar.

Lastly, Lloyd's cites *Jefferson Ins. Co. v. Health Care Ins. Exchange*, 247 N.J. Super. Ct. App. Div. 241, 588 A.2d 1275, 1278-79 (1991), for the proposition that, if two insurers are equally obligated to indemnify an insured, the insurer that does not contribute to a reasonable settlement is obligated to reimburse the other for half the settlement.  In *Jefferson*, the court held that one primary insurer was entitled to contribution from the other primary insurer if the settlement was reasonable in amount and entered in good faith.[24]  The *Jefferson*

---

[24] *Jefferson*, 588 A.2d at 1278.

court, however, did *not* hold that the contribution must be limited to half.  There, the plaintiff only sought to recover half of the settlement amount.[25]  The court therefore finds *Jefferson* distinguishable from the one at bar, and in any event, that it does not prevent the court from holding Lloyd's accountable for 100% of the Femia settlement.

E.     Prejudgment Interest.

First Specialty asserts that it should be awarded prejudgment interest in addition to the $445,000 paid to settle the Femia case, and the $26,021.68 paid to defend the case.  First Specialty suggests that interest run from August 3, 2004 (the date this suit was commenced), instead of when the underlying case was settled in August 2003.  Under New Jersey common law, prejudgment interest may be awarded in the discretion of the court in equitable actions. *See County of Essex v. First Union Nat'l Bank*, 186 N.J. 46, 891 A.2d 600, 608 (2006).  The basic rationale, of course, for awarding prejudgment interest is that the defendant improperly has had the use of the amount in question instead of the plaintiff.  *Id.*

In the case at bar, the court finds that an award of prejudgment interest is necessary and appropriate to rule First Specialty whole, *especially* since the amounts in question are liquidated.  New Jersey law allows for awards of prejudgment interest even if the damages are unliquidated.  *See George H. Swatek, Inc. v. North Store Graphics, Inc.*, 246 N.J. Super. Ct. App. Div. 281, 587 A.2d 629, 632-33 (1991).  Although no specific rate of interest is required in an equitable case like this one, the court will exercise its discretion and impose

---

[25] *Id.* at 1276.

an interest rate of 12% annum (simple, not compounded).  *See* New Jersey rule 4:42-11(b) (applicable to tort actions).

F.     First Specialty's Negligence Claim Against Ward.

First Specialty conceded during trial that, if the court ultimately were to determine that Lloyd's did not suffer prejudice as a result of late notice of the Femia claim, then First Specialty would not (and indeed, could not) pursue its negligence claim against Ward.  In this regard, First Specialty acknowledged that, without a finding of prejudice, First Specialty would be unable to prove an essential element of the negligence claim, to wit, a casual link between the damages claimed in this case and Ward's admitted breach of contractual duty as TPA to determine whether coverage existed under the First Specialty policy.  Accordingly, given that the court has made a finding of no prejudice, the court hereby grants as unopposed Ward's oral motion for judgment as a matter of law on First Specialty's negligence claim.

V.   Conclusion and Order

In consideration of the foregoing,

IT IS HEREBY ORDERED:

1.     Judgment shall be entered by the Clerk, in favor of First Specialty on its equitable subrogation claim against Lloyd's, for $608,069.63 (representing the sum of $445,000.00 paid to Femia and his legal counsel to settle the underlying case; $26,021.68 paid to Wellinghorst and his law firm to defend the underlying case; and $137,047.95 in prejudgment interest).  In addition, the judgment shall provide that First Specialty is entitled

to recover the taxable costs of this action from Lloyd's.  *See* Fed. R. Civ. P. 54(d).  *See also* D. Kan. Rule 54.1(a).

2. First Specialty's negligence claim against Ward is dismissed, with prejudice.

3. Within the time allowed by Fed. R. Civ. P. 52(b), First Specialty may file a motion to alter or amend the court's findings of facts, conclusions of law, and judgment, specifically, to make more clear First Specialty's previous requests for an award of attorneys' fees (*see* doc. 190, p. 36; doc. 366, p. 16; & doc. 368, pp. 11-14).  However, First Specialty should bear in mind that, under the unique facts of this case, and under the pleadings filed to date, the court is disinclined to award any attorneys' fees, i.e., First Specialty does not appear to have cited any precedent directly on point that this court has the power to make a statutory award of fees in this situation under New Jersey Rule 4:42-9(a)(6).

Dated this 8th day of January, 2007, at Kansas City, Kansas.


     s/James P. O'Hara
     James P. O'Hara
     U.S. Magistrate Judge